```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
LUMBERMENS MUTUAL CASUALTY          :
COMPANY,                            :
                                    :
            Plaintiff,              :        08 Civ. 1316 (HB)
                                    :
        -against-                   :        OPINION & ORDER
                                    :
RGIS INVENTORY SPECIALISTS, LLC,    :
CAMRAC INC. d/b/a ENTERPRISE        :
RENT-A-CAR, and ROBERT M. BIRARDI,  :
                                    :
            Defendants-Counterclaimants. :
-----------------------------------------------------------x
```

**Hon. HAROLD BAER, JR., United States District Judge:**

On April 8, 2003, nonparty Robert Shore ("Shore") was walking down a snowy Connecticut highway when he was hit by a minivan driven by Defendant Robert Birardi ("Birardi") in the course of his employment with Defendant RGIS Inventory Specialists, LLC ("RGIS"). The impact of the collision threw Shore to the side of the road, and he sustained serious injuries. The minivan was owned by Defendant Camrac, doing business as Enterprise Rent-A-Car ("Camrac"). Defendants were covered under a primary insurance policy issued by United States Fidelity & Guaranty ("Primary Insurer"), as well as an excess insurance policy issued by Plaintiff Lumbermens Mutual Casualty Company ("Lumbermens") to RGIS, the policyholder.

Shore's brother and conservator, David Shore, filed suit in Connecticut state court against Defendants ("Shore Action"), and on January 30, 2008, a jury returned a verdict for Shore finding Defendants 100% liable. On February 13, 2008, following the conclusion of the damages phase of the trial, the jury returned a verdict of more than $11 million in damages. After the trial court entered judgment for Shore, Defendants filed a notice of appeal to the Connecticut state appellate court on June 6, 2008. That appeal remains pending.

On February 8, 2008, Lumbermens filed an action in this Court seeking a declaratory judgment to the effect that Defendants are not entitled to coverage under Lumbermens' Excess Policy for any of the claims in the Shore Action, on the ground that Defendants failed to give timely notice of the accident, claim or suit to Lumbermens. The parties have filed cross motions for summary judgment. For the reasons set forth below, summary judgment is granted in favor of Defendants.

1

## I.  FACTUAL BACKGROUND

The following facts are undisputed.[1]  On April 8, 2003, the date of the accident, RGIS and Birardi were insured under a Business Automobile Liability Policy issued by RGIS's Primary Insurer ("Primary Policy").  The Primary Policy had insurance limits of $2 million.  RGIS and Birardi were also insured under the Excess Commercial Catastrophic Liability Policy ("Excess Policy"), issued by Lumbermens to RGIS as the policyholder.  Lumbermen's Excess Policy provides coverage for bodily injury and property damage in excess of the Primary Policy up to $25 million.  Camrac was qualified as an additional insurer under both policies.

Lumbermens Excess Policy required the insureds to notify Lumbermens "as soon as practicable of an 'occurrence' or an offense whenever it *appears likely* it will result in a claim involving this [Excess Policy]."  (McGregor Aff. Ex. B at 12 (emphasis added).)  "Occurrence" is defined in pertinent part as "an accident."  (*Id.* at 15.)  Similarly, the Excess Policy required the insureds to provide written notice to Lumbermens of a "claim or 'suit' as soon as practicable whenever it *appears likely* that such claim or 'suit' will involve this [Excess Policy]."  (*Id.* at 12 (emphasis added).)  While "claim" is not defined, "suit" is defined in pertinent part as "a civil proceeding in which damages because of 'bodily injury,' 'property damage,' 'personal injury' or 'advertising injury' to which this [excess] insurance applies are alleged."  (*Id.* at 16.)

Birardi, the driver of the vehicle, notified RGIS, his employer, of the accident at 8:30 a.m. on April 8, 2003, within a few hours after the accident.  By 8:50 a.m., RGIS reported the incident to its Primary Insurer and Gallagher Bassett Services, Inc. ("Gallagher Bassett"), the third-party administrator for the Primary Insurer.  RGIS notified Camrac of the accident later in the day on April 8, 2003.  By April 15, 2003, RGIS, Camrac and Birardi were aware that Shore was in critical condition.  Birardi received a letter of representation from Shore's counsel on or about April 21, 2003, concerning Shore's intent to pursue a claim, which Birardi facsimiled to RGIS on April 25, 2003.  Elco Administrative services ("Elco"), Camrac's claims administrator, received a letter of representation from Shore's counsel on or about April 23, 2003.  Elco's May 23, 2003 excess claim report states that Shore was paralyzed on one side, on life support and would have permanent physical deficits.  RGIS received a brief overview of Shore's injuries on May 8, 2003.

The Primary Insurer retained Cella, Flanagan & Weber, P.C. ("Cella") to provide Defendants with an assessment of the potential value of Shore's claim and thereafter to defend Defendants in the Shore Action.

---

[1] Unless otherwise indicated, the source of the facts in this background section is the "undisputed" portion of Defendants' Counter-Statement Pursuant to Rule 56.1, dated Sept. 16, 2008.

2

On May 11, 2003, a Middlebury, Connecticut Police Officer, Anthony Quicquaro, who witnessed the accident while he was on patrol, submitted an official Accident Report. His report stated that

> [i]n the course of the investigation, this officer interviewed . . . snow plow operators [who] were acting in that capacity that morning. All 3 had seen Shore walking west . . . in the hour preceding the accident. . . . According to the snow plow operators, he was seen, at times, walking in 'the middle of the road.' When he saw (or heard) a vehicle approaching, he would then step off to the side.
>
> As this officer [Officer Quicquaro] was traveling westbound he observed Shore walking. Shore was walking in the bare pavement (plowed) portion of the roadway. . . .
>
> The snow had fallen throughout the previous evening. The middle of the roadway was scraped down to bare pavement approximately 1 plow blade wide (12 feet) on the eastbound side of the double yellow line. When this officer observed Shore, he was walking on the part of the pavement that had been scraped clean. When this officer and Sgt. Williams examined the scene, there were no footprints or any other impressions which would lead to the conclusion that Shore could have been walking elsewhere besides the paved portion. . . .
>
> *Final Analysis: Primary responsibility rested on Shore* who should have been walking as far to the side of the roadway as possible. Because of the snow on the side of the roadway, the bare pavement section of the roadway was restricted to approximately 7 – 7.5 feet. . . . [T]here left very little room for safe passage. Shore chose to walk on the bare pavement. As a result, the minivan struck Shore while the van was still operating within all legal parameters. This officer personally witnessed the collision and saw that the minivan did not have enough reaction time to perform any type of evasive maneuver. In conclusion, Shore was in violation of [Connecticut General Statutes] 53-182, Reckless Use of the Highway by a Pedestrian.

(Weber Aff. Ex. 1 (emphasis added).)

The complaint against Defendants in the Shore Action, filed February 10, 2005, alleged that Shore sustained grave injuries as a result of the accident, including severe and massive head trauma resulting in a comatose state and prolonged unconsciousness, intestinal injuries, pneumonia and infection, closed fracture of second and third cervical vertebra, missing and damaged teeth, compound fracture of left clavicle, neurological impairment and impairment and/or loss of comprehension and cognitive abilities. (Ritzert Aff. Ex. 1.)

On June 15, 2005, Cella and Gallagher Bassett received a copy of Shore's Life Care Plan, which estimated Shore's continued medical and future damages to be approximately $3.7 million, as of about June 15, 2005. A mediation conference took place on June 21, 2007, and Shore's counsel made two settlement demands: $9.5 million and $7.5 million. Cella made two settlement offers: $50,000 and $100,000. The parties did not reach a settlement.

3

Defendants gave their first notice to Lumbermens of the occurrence, claim and suit on January 14, 2008, the day before jury selection began on January 15.  The trial was bifurcated, and following the completion of the liability phase on January 30, 2008, the jury found that Birardi was 100% responsible for the accident.  On February 13, 2008, following the conclusion of the damages phase of the trial, the jury returned its verdict totaling $11,131,539.85 ($6,850,000 for non-economic damages and $4,281,539.85 for economic damages).  On or about May 28, 2008, RGIS's post-trial motion to set aside the jury's verdict was denied by the trial court, and on February 8, 2008, Lumbermens commenced the instant declaratory judgment action against Defendants.  The parties cross move for summary judgment.

## II.  STANDARD OF REVIEW

A court will not grant a motion for summary judgment pursuant to Fed. R. Civ. P. 56 unless it determines that there is no genuine issue of material fact and the undisputed facts are sufficient to warrant judgment as a matter of law.  Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 250 (1986).  The court must resolve all ambiguities, and draw all inferences, against the moving party.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) (*per curiam*).  "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249.

## III.  DISCUSSION

Lumbermens seeks a declaratory judgment to the effect that it has no obligation to cover any recovery in the Shore Action on the ground that Defendants' notice was untimely.  An insured's failure to comply with the notice requirement vitiates coverage, and, consequently, the insurer is relieved of its coverage obligations.  *See Argo Corp. v. Greater N.Y. Mut. Ins. Co.*, 4 N.Y.3d 332, 339 (N.Y. 2005).

A.   **Choice of Law**

In the absence of a choice of law provision in the Excess Policy, Lumbermens urges this Court to apply New York law to the Excess Policy and its obligations thereunder, and Defendants argue that Michigan law should apply.  Further, the accident took place in Connecticut and Birardi is a resident of Connecticut; thus, that state too plays a role in the choice of law solution.

"The first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *Allstate Ins. Co. v. Stolarz*, 597 N.Y.S.2d 904, 905 (N.Y. 1993); *Globalnet Financial.com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006).  Here, there is an actual conflict between the laws of New York,

4

Connecticut and Michigan concerning whether an insurer can disclaim insurance coverage based on late notice without demonstrating that it was actually prejudiced. *See Am. Home Assur. Co. v. Int'l Ins. Co.*, 90 N.Y.2d 433 (N.Y. 1997); *Aetna Cas. & Sur. Co. v. Murphy*, 538 A.2d 219, 223 (Conn. 1988); *Wehner v. Foster*, 49 N.W.2d 87 (Mich. 1951). Lumbermens would benefit from the application of New York law, which would not require it to show that it was prejudiced by any untimely notice.

In resolving a choice of law issue, New York courts follow a "center of gravity" or "grouping of contacts" rule, which requires the application of the law of the state with the "most significant relationship to the transaction and the parties." *See, e.g.*, *Zurich Ins. Co. v. Shearson Lehman Hutton*, 84 N.Y.2d 309, 317 (N.Y. 1994). This approach generally dictates that a contract of liability insurance is subject to the law of the "principal location of the insured risk." *Id.* However, where, as here, the insurance policy in question covers risks that are spread throughout multiple states, the court must consult broader choice-of-law principles. *Id.* at 318.

An intermediary state appellate court in New York has held that "[i]n the case of a corporate insured seeking coverage under a policy covering risks in multiple states," the court should apply the law of the insured's domicile. *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 22-23 (N.Y. App. Div. 2006) ("*Foster Wheeler*"). The court held that in such a case "the state of the insured's domicile should be regarded as a proxy for the principal location of the insured risk." *Id.* at 24. Noting that the "grouping of contacts" theory requires the court to apply the policy of the "jurisdiction most intimately concerned with the outcome of the particular litigation," *id.* at 22 (quoting *Auten v. Auten*, 308 N.Y. 155, 161 (N.Y. 1954)), the court considered the competing jurisdictions' "governmental interests" in

> (1) regulating conduct with respect to insured risks within the state's borders; (2) assuring that the state's domiciliaries are fairly treated by their insurers; (3) assuring that insurance is available to the state's domiciliaries from companies located both within and without the state; and (4) regulating the conduct of insurance companies doing business within the state's borders.

*Id.* (citing *Fireman's Fund Ins. Co. v. Schuster Films, Inc.*, 811 F. Supp. 978, 984 (S.D.N.Y. 1993)).

The court found that these interests, "in the aggregate, weigh in favor of applying the law of the insured's domicile, notwithstanding that certain other states (*e.g.*, the states of the insurer's domicile, and where negotiation and contacting occurred) may share, to a lesser extent, in the fourth interest enumerated above." *Id.* at 23.

However, this Court is reluctant to interpret *Foster Wheeler* as imposing a bright-line rule. The case is distinguishable because it involved "a large number of excess liability insurance

5

policies," even hundreds, and thousands of asbestos-related personal injury claims against the insured. *Id.* at 18-19. Where, as here, only one policy and one cause of action is at issue, it is more feasible to assess the various states' contacts with the matter. Nevertheless, this Court affords the insured's domiciliary state substantial weight, in light of the "governmental interests" enumerated in *Foster Wheeler*.

Other courts applying New York law have examined the following factors, listed in the Restatement on Conflict of Laws § 193 in the context of an insurance policy with risks spread throughout multiple states: "the location of the insured risk; the insured's principal place of business; where the policy was issued and delivered; the location of the broker or agent placing the policy; where the premiums were paid; and the insurer's place of business." *Schwartz v. Twin City Fire Ins. Co.*, 492 F. Supp. 2d 308, 317 (S.D.N.Y. 2007), *rev'd on other grounds*, *Schwartz v. Liberty Mutual Insurance Co.*, 539 F.3d 135 (2d Cir. 2008); *Olin Corp. v. Ins. Co. of N. Am.*, 743 F. Supp. 1044, 1049 (S.D.N.Y. 1990), *aff'd*, 929 F.2d 62 (2d Cir. 1991). *See also Steadfast Ins. Co. v. Sentinel Real Estate Corp.*, 283 A.D.2d 44, 50 (N.Y. App. Div. 2001) ("Given the nationwide scope of [the insured's] operations, the principal location of the insured risk should be deemed to be the state where [the insured] is incorporated and has its principal place of business, from which it negotiated the special terms of the Policy, and where the Policy presumably was delivered to it (thus constituting the state where the contract was made.").

Thus, in *Schwartz*, the court applied California law to the insured's breach of contract claim against his insurers because (1) the policies listed the insured's address in California; (2) the only state-specific endorsements to the policies were California endorsements; (3) the insured had several hundred employees based in California and less than a dozen in New York.[2] 492 F. Supp. 2d at 318. Similarly, in *Olin*, the court applied New York law because (1) the insured had been headquartered in New York prior to 1970; (2) the insured maintained offices in New York after 1970; (3) the insured's insurance broker was located in New York; and (4) the significant aspects of contract formation and performance occurred in New York. 743 F. Supp. at 1049.

Here, the policyholder, RGIS, has its principal place of business in Auburn Hills, Michigan, and provides inventory services to corporate clients in all fifty states and internationally. It conducts its global operations, including its liability insurance program, out of its offices in Auburn Hills, Michigan. (Davidson Aff. ¶ 5.) Camrac and Birardi, are domiciled in Connecticut. Lumbermens has its principal place of business in Illinois. (Lumbermens' Mem. of L. 6.)

---

[2] The court also noted that the application of California law was unopposed. 492 F. Supp. 2d at 318.

6

At the time the excess insurance policy at issue was placed, RGIS's insurance broker was Marsh USA ("Marsh").  RGIS's risk manager, Teri Davidson ("Davidson"), negotiated the Excess Policy from RGIS's office in Auburn Hills, Michigan, and communicated with Marsh's office in Detroit, Michigan.  Marsh Detroit was responsible for the placement of RGIS's entire world-wide liability insurance program, including the Excess Policy.  (*See* Davidson Aff. ¶ 15.)  In negotiating the Excess Policy with Lumbermens, RGIS gave instructions to Marsh Detroit, which communicated with Marsh's office in New York ("Marsh New York"), which, in turn, communicated with Lumbermens' office in New York.  (*See* Defs.' Counterstatement ¶ 24.)  Marsh New York would then report back to Marsh Detroit.  (*Id.* ¶ 25.)  RGIS asserts that Marsh *Detroit* personnel had the exclusive authority to bind coverage.  (*Id.*)  Lumbermens claims that after Lumbermens' New York office completed its underwriting analysis, it delivered the Excess Policy to Marsh New York, but RGIS asserts that it received the policy in Michigan from Marsh Detroit. (*Id.* ¶ 26.)  In any event, it is undisputed that the Excess Policy was delivered to RGIS, the policyholder, at its Auburn Hills, Michigan office.  Further, RGIS paid premiums under the Excess Policy in Michigan, with funds drawn from a Michigan bank.  (*See* Davidson Aff. ¶¶ 14-16, 18-27.)

Further, Lumbermen's Excess Policy contains several riders, or "endorsements," which modify the policy, including endorsements titled "Michigan Changes" and "Michigan Changes-Cancellation and Nonrenewal."  (McGregor Aff. Ex. B.)  There are no other state-specific endorsements.  (*Id.*)

Therefore, while New York has some contacts with the Excess Policy, in light of the factors enumerated above and the weight given to the state of the insured's domicile, this Court will apply Michigan law.

**B.     Timeliness of Notice**

This Court now turns to the question of whether Defendants' notice was timely under the Excess Policy.  As described above, the Excess Policy required Defendants to notify Lumbermens of an accident, claim or suit when it "appear[ed] likely" that the accident, claim or suit would involve the policy, *i.e.*, when it appeared likely that the Primary Policy's $2 million limit would be exceeded.

The Michigan courts adhere to the principle that the language in an insurance policy is to be given its plain and ordinary meaning.[3]  *See, e.g.*, *Amway Distributors Benefits Ass'n v. Northfield*

---

[3] Because this Court applies Michigan law, it is not bound by the case cited by Lumbermens, *Christiania General Insurance Corp. of New York v. Great American Ins. Co.*, 979 F.2d 268 (2d Cir. 1992), which applied New York law.  In *Christiania*, the Court interpreted the "appears likely" language in a notice

7

*Ins. Co.*, 323 F.3d 386, 392 (6th Cir. 2003) (applying Michigan law).  The Oxford English Dictionary defines "likely" as "[h]aving an appearance of truth or fact; that looks as if it would happen, be realized, or prove to be what is alleged or suggested; *probable*."  Oxford English Dict. (2d ed. 1989) (emphasis added).   The Michigan Supreme Court, in a different context, has interpreted "likely" to mean "of such nature or so circumstantial as to make something probable and having better chance of existing or occurring than not."  *Moll v. Abbott Labs.*, 444 Mich. 1, 22 (Mich. 1993) (quoting Black's Law Dictionary 6th ed.).[4]  Therefore, Defendants were obligated to provide notice to Lumbermens once the accident, claim or suit appeared probable, or more likely than not, to exceed more than $2 million.[5]

In *Aetna Casualty & Surety Co. v. Dow Chemical Co.*, 10 F. Supp. 2d 800 (E.D. Mich. 1998), the court, applying Michigan law, observed that "rubbery language" in excess insurance policies, such as "appears likely" language in a notice provision, "is designed to give 'the insured some leeway or discretion in forming a judgment about when . . . protection is implicated.'"  *Id.* at 809 (quoting 684 N.E.2d at 606).  The court held that the "appears likely" language in the excess policy's notice provision required the excess insurer "to show that the insured 'had information or had formed an opinion at a particular time that a claim would implicate' the policy and 'then failed to notify the insurer for an unreasonable period thereafter.'"  *Id.* (quoting *Employers' Liability Assur. Corp., Ltd. v. Hoechst Celanese Corp.*, 684 N.E.2d 600, 606 (Mass. 1997)).  The excess insurer must bear its burden without the benefit of hindsight.  *See id.*  Because the excess insurers failed to establish, as a matter of law, the date on which the insured "knew" that the claim would exhaust its primary policies, the court denied summary judgment.  The court found that questions of material fact existed regarding when the insured "should have *reasonably* concluded that its excess insurance policies were likely to be implicated."  *Id.* at 829 (emphasis added).

Here, the third-party claims administrator, Gallagher Bassett, and Discovery Managers, Ltd., the claims managing agent for the Primary Insurer, investigated the incident, communicated with

---

provision to mean that the insured had a duty to provide notice when "a reasonable insured in [the insured's] position could have believed it 'appeared likely' the claims that it was being told about would involve [the] reinsurance."  *Id.*

[4] Interestingly, there is no entry for "likely" in the seventh edition of Black's Law Dictionary.

[5] The cases cited by Lumbermens to support its proposition that notice was required within a reasonable period of time after the accident are inapplicable because the policies at issue in those cases expressly required notice within a "reasonable period of time," or "as soon as practicable," after an occurrence.  Here, in contrast, Lumbermens and RGIS agreed to an "appears likely" standard.  *See Brennan Bros. Co. v. Lumbermens Mut. Cas. Co.*, 789 N.Y.S.2d 428, 429 (N.Y. App. Div. 2005); *St. James Mech., Inc. v. Royal & Sunalliance*, 845 N.Y.S.2d 83, 84 (N.Y. App. Div. 2007); *Great Canal Realty Corp. v. Seneca Ins. Co.*, 5 N.Y.3d 742, 743 (N.Y. 2005); *White v. New York*, 81 N.Y.2d 955, 957 (N.Y. 1993).

Shore's counsel and retained a law firm, Cella.  (*See* Spray Aff. Exs. 3-8, ¶¶ 9-15; Weber Aff. ¶ 5; Davidson Aff. ¶¶ 31-33.)  Every professional who investigated the accident on behalf of RGIS and Birardi found that any finding of liability against Defendants was unlikely, *i.e.*, less than 50%, and that the claim should be fully resolved well within the limits of the Primary Policy.  Initially, the professionals thought the claim was so insubstantial as to have no settlement value at all, although the Primary Insurer eventually set a reserve of $25,000, which remained in place from April 2003 through July 2005.  The indemnity reserves were increased to $500,000 only after the Shore Action was commenced, and to $1 million in April of 2007, in anticipation of the formal mediation of the claim.  (*See* Spray Aff. Ex. 9; Davidson Aff. ¶ 40, Exs. 12-14.)  The Primary Insurer's reserves never exceeded $1 million, half the limit of the Primary Policy.  (*See* Davidson Aff. ¶¶ 39-43.)

      Reserves were set so low because Defendants believed that they would likely be held not liable, or, if they were **held liable**, that they would be liable for only a small amount of damages, due to Connecticut's comparative fault statute, which applied to Shore's claim.  That statute provides that Shore would not be entitled to any damages if he were found to be more than 50% liable for the accident.  In light of Officer Quicquaro's Accident Report, quoted above, in which an eyewitness found that Shore was primarily responsible for the accident, Defendants' belief was not unreasonable.  The officer found that Shore was walking in the middle of the road and Birardi had no time to avoid a collision.  Further, the facts that the minivan driven by Birardi struck Shore just after Birardi crested a hill, another vehicle was approaching toward Birardi with its lights on, and Shore, who was dressed in dark clothing, was not immediately visible to Birardi bolster the reasonableness of Defendants' belief that liability was at best a question mark.  (*See* Weber Aff. Ex. 1.)

      On August 19, 2004, Cella completed a "Liability Damages Opinion Letter," with the purpose of determining, what, if any, damages *might* result from an action arising out of Shore's injuries, based on the information known at that time.  (Ritzert Aff. Ex. 27.)  Cella estimated the value of Shore's injuries, exclusive of future medical costs, to be between $1.25 million and $4 million.  (*Id.*)  However, the counsel reached such an estimate explicitly "without regard to comparative fault" and, indeed, opined that the likelihood of a verdict for *Defendants* on liability issues was 90%.  (*Id.*)

      Nearly three years later, Defendants' view had not changed, after commencement of the Shore Action and additional investigation.  In a May 4, 2007 mediation report to Gallagher Bassett, Cella reiterated that "this case presents the rare situation where the chance of a defense verdict outweighs the chance of a plaintiff verdict."  (Ritzert Aff. Ex. 37 at 20.)  However, noting that there

was a "slight" risk of a substantial damages award, Cella noted that "there is considerable value to settling this claim short of trial." (*Id.*) To that end, Cella estimated the damages in the unlikely event that a jury would return a plaintiff's verdict. Even then, Cella found that "the most likely scenario, should a jury return a plaintiff's verdict, presently consists of the 50% comparative fault threshold," which would permit Shore to recover 50% of the amount of damages, *i.e.*, under Cella's estimates, in the unlikely event of a plaintiff's verdict, Shore could recover between $1.5 million and $3.5 million. (*Id.*) Although this range could implicate the Excess Policy, it does not suggest that it "appeared likely" to Defendants that the Excess Policy would be implicated. Indeed, the report is clear that Defendants continued to believe that Shore most likely would recover nothing.[6]

It is undisputed that settlement negotiations continued to the eve of trial. Once Defendants realized that they would not reach a settlement, they notified Lumbermens of the accident, claim and suit. Given the above and other evidence submitted by the parties, this Court is of the view that Defendants, as a matter of law, provided timely notice within the meaning of the Excess Policy.

## C.     Actual and Material Prejudice

Because I find Defendants' notice to have been timely, I need not reach the question of whether Lumbermens has demonstrated actual and material prejudice. "It is a well-established principle of Michigan law that *untimely* notice will not excuse an insurer's obligation to indemnify unless it can prove it was actually and materially prejudiced by the insured's delay." *Aetna*, 10 F. Supp. 2d at 810 (emphasis).

This Court finds, nevertheless, that Lumbermens has failed to show actual and material prejudice. Under Michigan law, "[p]rejudice will be found where the delay 'materially' impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party." *West Bay Exploration v. AIG Specialty Agencies*, 915 F.2d 1030, 1036-37 (6th Cir. 1990). While the insurer does not need to prove that but for the delay it would have avoided liability altogether, *id.* at 1037, it may not establish actual prejudice by simply asserting that the delay in providing notice created lost opportunities, *Aetna*, 10 F. Supp. 2d at 813. Rather, "the insurer must identify 'the precise manner in which its interests have suffered.'" *Id.* (quoting *Hoechst*, 684 N.E.2d at 608).

---

[6] Moreover, Defendants believed Shore's settlement demands of $9.5 million and $7.5 million were so unreasonably high that they countered with offers of $50,000 and $100,000. Had it appeared probable to Defendants that they would be liable for more than the $2 million Primary Policy limit, they likely would not have made such low offers.

10

Michigan courts consider "whether the delay has materially impaired the insured's ability: (1) to investigate liability and damage issues so as to protect its interests; (2) to evaluate, negotiate, defend, or settle a claim or suit; (3) to pursue claims against third parties; (4) to contest the liability of the insured to a third party; and (4) to contest its liability to its insured." *Id.* Further, an insured's claims of prejudice "must be supported by more than the insurer's bald assertion that the opportunity to [evaluate, negotiate, defend, or settle a claim or suit] has been lost." *Id.* at 814. The insurer must present evidence that establishes that its position was actually prejudiced. *Id.*

Here, Lumbermens asserts that if it had received notice earlier, it could have participated in the mediation conference and settlement negotiations and ensured that Defendants' defense counsel retained the proper experts to refute Shore's theory of liability and damages in the underlying action. However, Lumbermens provides no evidence, beyond its own speculation, to show that it would have participated in the mediation, or procured experts, or that the mediation would have likely reached closure or generally that the Shore Action would have ended any differently. *See Sudul v. Coregis Insurance Co.*, No. 214715, 2001 WL 633698, at *4 (Mich. Ct. App. (2001) (holding that excess insurer had "not provided any support for its assertion of prejudice arising merely from its obligation to pay a portion of the jury verdict, a risk it had contractually assumed and for which it was compensated [in its insurance policy]").

Here, the Excess Policy explicitly stated that Primary Insurer would defend the insured and investigate claims. In *Coregis*, although the excess insurer did not receive notice of its potential liability until after the completion of the second trial, the court noted that "[a]s a true excess insurer, Coregis expected the primary insurer to conduct the investigation, negotiation, and defend the claims until the primary insurer's limits were exhausted." *Id.* at *3 (citing *Bosco v. Bauermeister*, 456 Mich. 279, 295 (Mich. 1997). The excess insurer cannot simply second-guess the primary and complain that it would have handled the claim or defense differently, but bears a heavy burden of demonstrating that the claim was not handled and defended in a manner consistent with normal industry practices. *See id.* at *2. The *Coregis* court thus affirmed summary judgment in favor of insureds.

Finally, the fact that Lumbermens refused to participate in the defense once it did receive notice, (*see* Tr. of Oral Argument, Jan. 7, 2009, 20:20-25), militates against prejudice. Any prejudice "does not become material where the carrier, upon notice, does not act or properly act to protect its interest and/or that of its insured," because "[s]uch prejudice was not attributable, in its ultimate sense, to the insured's failure to give notice of suit, but rather to the insurance carrier's failure to act upon receiving notice." *Burgess v. Am. Fidelity Fire Ins. Co.*, 310 N.W.2d 23, 25

(Mich. 1981); *see also Upp. Doc. (quoting Cobb v. Mich. Surety Co.*, 768 F. Supp. 1186, 1205 (W.D. Mich. 1990)) ("Courts have also considered whether the insurer, after receiving late notice, acted promptly to protect its interests and those of its insured.").

Here, Lumbermens received notice on January 14, 2008, a day before jury selection. However, the jury did not return a verdict with respect to liability until more than two weeks later, on January 30, 2008, and the damages phase began sometime after this date. The jury did not return its verdict on damages until February 13, 2008, approximately one month after Lumbermens was notified. Further, as the damages phase of the trial began, a series of requests were made to Lumbermens to reconsider its position, but Lumbermens reiterated its denials of coverage, (*see* Davidson Aff. Ex. 15-18), and failed to participate in the trial.

Therefore, even if Defendants' notice were untimely, Lumbermens has not established material and actual prejudice as a matter of law.[7]

## IV. CONCLUSION

For the foregoing reasons, Lumbermens is not relieved of its coverage obligations under the Excess Policy because Defendants' notice was not untimely and, even if it were, Lumbermens has not shown actual and material prejudice. Lumbermens' motion for summary judgment is DENIED, and Defendants' motion for summary judgment is GRANTED.

The Clerk of the Court is instructed to close this matter and remove it from my docket.

**IT IS SO ORDERED.**
New York, New York
January 21, 2009

_____
U.S.D.J.

---

[7] Many of the cases cited by Lumbermens with respect to prejudice are not on point because they address the prejudice caused by late notice to a *primary* insurance carrier, which, due to its obligation to investigate and defend a claim, and to provide the first layer of coverage, stands in a much different position from an excess carrier. *See, e.g., Wehner v. Foster*, 331 Mich. 113 (Mich. 1951); *Wood v. Duckworth*, 401 N.W.2d 258 (Mich. Ct. App. 1986).

12